UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KATHY BIGGERS, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 3:10-cv-0128 |
| v. | ) Judge Sharp |
| | ) |
| ACCELECARE WOUND CENTERS, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiff's complaint before this Court alleges unlawful inducement of breach of contract under Tennessee common law and Tenn. Code Ann. § 47-50-109 and tortious interference with a business relationship under Tennessee common law. Plaintiff also seeks a declaratory judgment regarding whether a non-competition agreement purportedly executed in favor of Defendant Accelecare Wound Centers, Inc. ("Accelecare") on which Plaintiff's signature appears is valid and enforceable. (Docket No. 1-1) Defendant has filed a Motion for Summary Judgment (Docket No. 72) regarding all matters in the complaint. Plaintiff has filed a Motion to Strike Defendant's Memorandum in Support of its Motion for Summary Judgment (Docket No. 77) because it violates the Court's May 1, 2013 Case Management Order. (Docket No. 52) For the reasons that follow, Plaintiff's motion will be denied, and Defendant's motion will be granted in part and denied in part.

### I. FACTUAL BACKGROUND

1

Defendant Accelecare is a comprehensive wound care and disease management company that provides full service wound management solutions to hospitals and related health care organizations across the United States. (Docket No. 82 ¶ 1). Plaintiff Kathy Biggers was employed by Defendant in the position of Vice President of Business Development in Nashville, Tennessee, from February 25, 2008 to April 24, 2009. (Docket No. 82 ¶¶ 2, 13). While working for Defendant, Plaintiff was responsible for procuring advanced wound care center contracts with hospitals in various states. (Docket No. 82 ¶ 3). Although Plaintiff was employed with Defendant for over a year, she did not procure any contracts and was terminated for failure to develop new business. (Docket No. 82 ¶ 13).

Defendant contends that at the time of her hire, Plaintiff was presented with a non-competition agreement ("Agreement") which she signed. (Docket No. 82 ¶ 5). Although Plaintiff does not remember signing the Agreement, she admits that her signature appears on the document. (Docket No. 1-1 ¶ 21). The Agreement is governed by the law of the state of Washington, and prohibits Plaintiff from working with a competitor of Defendant in any geographic market in which Defendant operates for a period of two years after the end of her employment. (Docket No. 82 ¶ 6, 8). Plaintiff also executed a separate confidentiality agreement which prohibits her from soliciting Defendant's customers and using Defendant's confidential and proprietary information. (Docket No. 82 ¶ 9).

After Plaintiff was terminated by Defendant, she gained employment at National Healing Corporation, a competitor of Defendant, as Vice President of Business Development. (Docket No. 82 ¶ 14). Plaintiff's employment status at National Healing was at-will. (Docket No. 82 ¶ 15). Plaintiff signed a confidentiality and non-competition agreement with National Healing that required Plaintiff to make certain representations, including an affirmation that she was not a

party to any other agreement which would prevent her from working at National Healing. (Docket No. 82 ¶ 16). Plaintiff did not disclose her non-competition agreement with Defendant to National Healing. Id.

Upon discovering that Plaintiff was employed by National Healing in a business development role, Defendant, through counsel, sent a December 22, 2009 letter to Plaintiff informing her that she was in violation of the Agreement and requesting that she terminate her employment with National Healing. (Docket No. 82 ¶ 18). Defendant also sent a letter to National Healing on the same day, informing it that Plaintiff's employment violated her non-competition agreement with Defendant, and asking National Healing to confirm that it had not used any of Defendant's confidential or proprietary information. (Docket No. 82 ¶ 19). The letter also stated:

> [Defendant] hope[s] to avoid legal action, but [Defendant] needs to ensure that all parties respect the contractual arrangement that [Plaintiff] accepted when she became [Defendant's] employee. [Defendant] look[s] forward to [National Healing's] confirmation that [Plaintiff] is no longer a National Healing employee.

(Docket No. 76-1). Despite the letter, Plaintiff continued her employment with National Healing. (Docket No. 82 ¶ 20). As a result, on January 14, 2009, Defendant contacted National Healing by telephone and informed it that Defendant intended to take legal action if Plaintiff persisted in violating the Agreement. Id.

On January 15, 2010, National Healing terminated Plaintiff's employment. According to Faye Traeger, National Healing's Vice President of Human Resources during the relevant time period, Plaintiff was terminated "for falsification of company documents" and "misrepresenting her obligations to [Defendant] by signing National Healing's confidentiality and non-competition agreement." (Docket No. 75 ¶¶ 8, 9). However, according to Bob Bauman, National Healing's

3

Chief Development Officer during the relevant time period, Plaintiff was terminated "based on [Defendant's] threats of legal action against National Healing." (Docket No. 82-1 ¶ 14).

## II. MOTION TO STRIKE

Plaintiff moves this Court to strike Defendant's Memorandum in Support of its Motion for Summary Judgment because it fails to comply with the Court's case management order requiring the parties' dispositive motion briefs to not exceed twenty pages. Defendant's memorandum consists of twenty-three pages. Defendant subsequently filed a Motion for Leave to Exceed Page Limitation (Docket No. 78) which the court granted (Docket No. 81). Because the Court granted Defendant's motion for leave to exceed the page limit, Plaintiff's Motion to Strike will be denied.

## III. SUMMARY JUDGMENT

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986). However, the nonmoving party must rely on more than "[c]onclusory assertions, supported only by Plaintiff's own opinions." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008). Rather, Plaintiffs must "set out specific facts showing a genuine issue for trial." Harvey v. Campbell County, Tenn., 453 Fed. Appx. 557, 561 (6th Cir. 2011).

a. **Choice of Law**

As an initial matter, the Court must determine the applicable law in light of the choice of law provision present in the Agreement. A federal district court is required to apply the choice of law rules of the forum in which it sits. First Response, Inc. v. TMC Servs., Inc., 2013 WL 5434712, at *6 (M.D. Tenn. Sept. 27, 2013) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In this case, Tennessee choice of law rules apply. In Tennessee, if the parties to a contract manifest an intent to apply the laws of a jurisdiction other than that in which the contract was executed, then that intent will be honored as long as the choice of law provision was executed in good faith, the jurisdiction chosen bears a material connection to the transaction, the basis for the choice of law is reasonable and not merely a sham or subterfuge, and the choice of law is not contrary to a fundamental policy of another state having a materially greater interest or whose law would otherwise govern. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (citing Restatement (Second) of Conflict of Laws § 187 (2)). In this case, the parties agree that Washington law governs the Agreement, and there are no allegations of bad faith. Application of Washington law is reasonable in this instance because Defendant's principal place of business is in Washington (Docket No. 1-1 ¶ 2) and Plaintiff attended orientation and training in Washington (Docket No. 82 ¶ 2). Finally, the parties do not allege that application of Washington law would violate a fundamental public policy of Tennessee, the only other state with a material interest in this matter, and the Court finds none. Accordingly, it is determined that Washington law governs issues pertaining to the Agreement.

As to the remaining tort claims, the Court finds that Tennessee law applies because Tennessee is the state in which Plaintiff's alleged injury occurred. Banc Card Georgia, LLC v. United Cmty. Bank, 2014 WL 3700602, at *8 (E.D. Tenn. July 24, 2014) (citing Carbon

5

Processing & Reclamation, LLC v. Valero Mktg. & Supply Co., 2011 WL 4915886, at *5 (W.D. Tenn. Oct. 17, 2011) (finding that Tennessee applies the law of the state where the injury occurred for tort claims such as tortious interference with a contractual relationship.)

   **b. Validity of Non-Competition Agreement**

Defendant seeks summary judgment regarding Plaintiff's declaratory judgment claim. In her complaint, Plaintiff asks the Court to declare the following: (1) whether Plaintiff is bound by the Agreement even though she has no "actual knowledge" of it (Docket No. 1-1 ¶ 23), and (2) if she is so bound, whether the Agreement is valid and enforceable (Docket No. 1-1 ¶¶24-25). Defendant contends that it is entitled to summary judgment as to both issues because the undisputed facts show that Plaintiff's signature is present on the Agreement, and the Agreement is enforceable.

The Court finds that Defendant is entitled to summary judgment regarding the first issue. Plaintiff admits that her signature is on the Agreement. Her mere assertion that she does not remember signing the Agreement is insufficient to create a genuine issue of material fact. Simpson v. Inter-Con Sec. Sys. Inc. 2013 WL 1966145 at *5 (W.D. Wash. May 10, 2013) (citing Blanford v. Sacramento County, 406 F.3d 1110, 1113 n. 3 (9th Cir. 2005)) ("[Plaintiff's] mere assertion that he does not remember signing the agreement is insufficient to create a genuine issue of material fact.") See also, Alexander & Alexander, Inc. v. Wohlman, 578 P.2d 530, 536 (1978) (finding that a party's signature on the documents clearly manifested acceptance of the terms). Thus, Plaintiff's admission that her signature appears on the Agreement is sufficient to bind her to the Agreement, and summary judgment will be granted as to this matter.

Regarding the second issue, the Court finds that there is a genuine issue of material fact as to whether the Agreement is enforceable. Washington courts have determined that covenants not to

compete upon termination of employment are enforceable if they are reasonable. Knight, Vale & Gregory v. McDaniel, 680 P.2d 448, 451-52 (1984) (citing Sheppard v. Blackstock Lumber Co., Inc., 540 P.2d 1373 (1975). Whether a covenant is reasonable involves a consideration of three factors: "(1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant." Id. The parties agree the third factor is inapplicable to this case; however, Plaintiff contends that the Agreement is unenforceable pursuant to the remaining factors. Because the Plaintiff has offered evidence showing that the Agreement may not have been necessary for the protection of the business or goodwill of Defendant, summary judgment as to the declaratory judgment claim will be denied.

Specifically, it is not clear from the evidence that Plaintiff's employment with Defendant armed her with an unfair competitive advantage that could jeopardize Defendant's business. For example, it does not appear that Plaintiff's work as Defendant's Vice President of Business Development put her in a position to exert influence over Defendant's clients after leaving Accelecare and going to work for National Healing. Defendant has failed to show that Plaintiff had access to confidential client lists or had relationships with or influence over Defendant's clients. It is undisputed that Plaintiff's work generally pertained to the recruitment of potential customers, and Plaintiff has offered evidence that her job with Defendant did not involve working closely with Defendant's clients (Docket No. 82-2 ¶ 4). Accordingly, Defendant has failed to establish, through undisputed evidence, that Plaintiff's non-competition agreement is necessary for the protection or goodwill of its business.

7

The Court finds Amazon.com, Inc. v. Powers, 2012 WL 6726538 (W.D. Wash. Dec. 27, 2012) particularly instructive. In Amazon, the plaintiff worked as a vice president in Amazon's Web Services division and was responsible for sales of Amazon cloud computing services before going to work for a competitor. Id. at *1. The court analyzed the reasonableness of two bans contained in the plaintiff's non-competition agreement with Amazon, including a ban not to do business with Amazon's customers and a ban from working in any competitive capacity against Amazon. In finding the latter ban unenforceable, the court noted that Washington courts find restrictions that prevent an employee from taking on any competitive employment more suspect than mere bans on working with former clients or customers. Id. at *9 (citing Perry v. Moran, 748 P.2d 224, 228 (Wash. 1987)). It also stated:

> [Amazon's] ban on working with former customers serves to protect the goodwill it has built up with specific businesses. A general ban on [the plaintiff's] competing against Amazon for other cloud computing customers is not a ban on *unfair* competition, it is a ban on competition generally. Amazon cannot eliminate skilled employees from future competition by the single expedient of hiring them. To rule otherwise would give Amazon far greater power than necessary to protect its legitimate business interest.

Here, the Agreement contains a general restriction on Plaintiff's employment with any competitive business. As such, it is suspect under Washington law. Id. See also, A Place for Mom, Inc. v. Leonhardt, 2006 WL 2263337 at *3 (W.D. Wash. Aug. 4, 2006) (citing Labriola v. Pollard Group, Inc., 100 P.3d 791 (Wash. 2004) (finding that barring the plaintiff from working on "any…services that are competitive" with former employer's services is unreasonable.) Further, Defendant, like Amazon, is not attempting to prevent unfair competition by protecting the business and goodwill it has generated in relationships with its clients; rather, it is attempting to ban Plaintiff from competing for customers in the market place and from general competition

8

against Defendant. Under Amazon, enforcing a non-competition agreement with such an effect would give Defendant "far greater power than necessary to protect its legitimate business interest." See also, Labriola, 100 P.3d at 800 ("The agreement at issue here is unreasonable because it bars [the plaintiff] from working in his field of expertise even where he takes no unfair advantage of his former employer.")[1]

While Defendant may have a valid argument that Plaintiff's previous work for Defendant as Vice President of Business Development somehow gives her an unfair advantage in the market place, Defendant has failed to adequately articulate it for summary judgment purposes. Defendant's representative Robin Walsh testified that Plaintiff received on-the-job training at hospitals that were already clients of Defendant so she could learn how to form relationships with potential customers in her business development role. (Docket No. 74-2). However, this testimony does not show that Plaintiff worked or established a relationship with Defendant's already-existing clients outside the training context in the course of her regular job duties, nor does it establish that Plaintiff's training gave her proprietary, specialized information such that her work at a competing company is unfair to Defendant.

Walsh also testified that Defendant has a customized clinical database called Accelechart; however, he admitted certain facts that minimize the proprietary nature of Accelechart. For example, Walsh stated that many companies have systems that are similar to Accelechart, and that Accelechart is actually a modified form of a program called NetHealth which was purchased

---

[1] This case is distinguishable from Perry v. Moran, 748 P.2d 224 (Wash. 1987) and Knight, Vale & Gregory v. McDaniel, 680 P.2d 448 (Wash. 1984), the two cases Defendant cites in support of its position. Perry and Knight involved accountants who left employment with accounting firms to open their own offices and serve the clients of their former employers. In both cases, the court found the employer's legitimate business interest to be protection and preservation of the existing client base from depletion by a former employee. Knight, 680 P.2d at 452; Perry, 748 P.2d at 229. Here, Defendant has not established that its existing client base was in need of protection from depletion by Plaintiff.

9

from a third party and later customized for Defendant. Walsh also failed to specify how Plaintiff could use Accelechart to compete unfairly against Defendant. Plaintiff's alleged access to and knowledge of Accelechart, therefore, is not sufficient to support Defendant's motion for summary judgment.

Finally, Walsh testified that Plaintiff has knowledge of Defendant's confidential information contained in the management contracts they offer to potential clients. Defendant, Walsh alleged, competes with other businesses based on the promises outlined in their management contracts. Walsh, however, does not specify the nature of the promises or how the promises can be used to outbid a competitor. Further, he does not describe how Plaintiff could use her knowledge of the contracts to compete unfairly with Defendant, and Plaintiff denies ever seeing any of Defendant's contracts. Under these circumstances, the Court cannot determine, for summary judgment purposes, whether the non-competition agreement is reasonable and necessary to protect Defendant's legitimate business interests.

For the reasons stated above, the Court finds that Plaintiff's signature binds her to the Agreement if the Agreement is valid; however, there are genuine issues of material fact as to whether the Agreement is reasonable and enforceable under Washington law. Accordingly, Defendant's motion for summary judgment regarding Plaintiff's declaratory judgment claim will be denied.

### c. Inducement of Breach of Contract

In her complaint, Plaintiff alleges that Defendant caused National Healing to terminate her, thereby inducing a breach of Plaintiff's employment contract with National Healing pursuant to Tenn. Code Ann. § 47-50-109 and Tennessee common law. In her Response to Defendant's Motion for Summary Judgment, however, Plaintiff admits that she did not have an employment

contract with National Healing and is therefore unable to prove her inducement of breach of contract claims. As a result, Plaintiff does not oppose their dismissal. Accordingly, Plaintiff's claims related to inducement of breach of contract will be dismissed.

### d. Interference with Business Relationship

Plaintiff claims Defendant interfered with her employment relationship with National Healing when it sent the December 22, 2009, letter and initiated the January 14, 2009, telephone call that allegedly resulted in Plaintiff's termination. In order to establish an interference with business relationship claim, Plaintiff must demonstrate the following: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002). The fourth factor requires *either* improper motive or means, not both. L-S Indus., Inc. v. Matlack, 641 F.Supp.2d 680, 683-84 (E.D. Tenn. 2009).

Defendant contests the fourth element and argues that Plaintiff has failed to show Defendant acted with an improper motive or improper means in seeking to have her business relationship with National Healing terminated. For the following reasons, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to the fourth element of her interference with business relationship claim, and summary judgment will be granted.

With regard to the "improper motive" element, "the plaintiff [must] demonstrate that the defendant's predominate purpose was to injure the plaintiff." Id. (citing Trau-Med, 71 S.W.3d

at n. 5). In determining whether a defendant's motive was improper, a court must evaluate whether "the acts of which complaint is made…rest on some legitimate interest" or if they "extend beyond the bounds of doing business in a freely competitive economy." Fulmer v. MPW Indust. Servs., Inc., 2006 WL 305225 at *3 (M.D. Tenn. Feb. 8, 2006) (citing Trau-Med, 71 S.W.3d at 700). Acting out a desire to protect one's competitive interest does not extend beyond the bounds of doing business in a freely competitive economy. Id. at *4 (citing Trau-Med, 71 S.W.3d at 700).

Here, the evidence shows that Defendant's acts in sending the December 22, 2009 letter and making the January 14, 2009, telephone call were not improperly motivated; rather, they were driven by Defendant's legitimate desire to enforce the Agreement and protect its business interests. For example, the letter primarily concerns an assertion that Plaintiff was in violation of her non-competition agreement and seeks to determine whether National Healing had used Defendant's confidential or proprietary information. (Docket No. 76-1). In the telephone call, Defendant informed National Healing that it would take legal action if Plaintiff continued to violate her agreement not to compete. (Docket No. 82 ¶ 20). Finally, Plaintiff admits that one of the "obvious inferences" from the evidence is that Defendant "wanted to prevent [Plaintiff]/National Healing from competing." (Docket No. 83 p. 16). Thus, the evidence shows that Defendant was driven by a legitimate, proper desire to protect its business interests through enforcement of the Agreement. Id. (finding the defendant's efforts to enforce a non-competition agreement to be without impropriety and properly motivated by a desire to protect its competitive interest). See also, Riggs v. Royal Beauty Supply, Inc., 879 S.W.2d 848, 851-52 (Tenn. Ct. App. 1994) (finding no evidence in the record from which a jury could reasonably

find improper motive where the defendant's actions were letters notifying the plaintiff that he was in violation of his non-competition agreement).

Additionally, there is no evidence that Defendant was motivated by a desire to harm Plaintiff. For example, Plaintiff makes no allegation that Defendant attempted to carry out the Agreement in bad faith by enforcing it even though Defendant did not believe the Agreement was properly executed or valid. Similarly, there is no evidence that Defendant singled Plaintiff out by, for instance, seeking to enforce Plaintiff's non-competition agreement while foregoing pursuit of other employees' covenants not to compete.

Plaintiff's allegation that Defendant wanted to "prevent [Plaintiff] from working for anyone in the industry" is unpersuasive. Plaintiff bases her argument on the fact that Defendant's letter to National Healing broadly demanded that National Healing end its employment relationship with Plaintiff without any inquiry regarding the territories in which Plaintiff was performing work. Because Defendant did not inquire as to her work territory in the letter and did not otherwise seek such information, Plaintiff contends that Defendant could not have definitively known Plaintiff was in violation of the Agreement. As a result, the only logical inference, according to Plaintiff, is that Defendant sent the letter and made the telephone call to keep Plaintiff from working in the industry in any capacity. Defendant's failure to inquire as to the scope of Plaintiff's work territory, however, is insufficient to show that Defendant desired to harm Plaintiff.

Specifically, the Court disagrees that the "only logical inference" to be drawn from Defendant's failure to inquire is that Defendant wanted to prevent Plaintiff's employment under circumstances beyond the scope of the Agreement. Plaintiff has not shown that Defendant did not have independent knowledge of Plaintiff's work territory before it sent the letter. In fact,

Plaintiff curiously argues that Defendant knew Plaintiff was competing for a potential client in Pikeville, Kentucky, an area covered by the Agreement, before it sent the letter to National Healing. (Docket No. 82 ¶ 11, 17). Thus, if Plaintiff's allegations are true, it was not necessary for Defendant to inquire as to Plaintiff's work territory in the letter because it already knew that she was in breach of the Agreement.

Furthermore, Defendant attached the Agreement to the December 22, 2009, letter to enable National Healing to review the validity of Defendant's claim. In other words, Defendant gave National Healing the opportunity to independently evaluate whether Plaintiff was in violation of the Agreement and its terms related to territorial scope. This fact supports the theory that Defendant was legitimately motivated by a desire to enforce the Agreement and contradicts Plaintiff's allegation that Defendant wanted to prevent Plaintiff from working for anyone in the industry under any circumstances. Accordingly, Plaintiff has failed to illustrate that Defendant was improperly motivated in contacting National Healing through the letter and telephone communications.

The Court now turns to the "improper means" element. The Tennessee Supreme Court has provided the following examples of "improper means":

> [T]hose means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

Trau-Med, 71 S.W.3d at 704.

In this case, the alleged wrongful means do not amount to the type of overtly unethical or independently tortious conduct described by the Court in Trau-Med. Plaintiff alleges that Defendant's threats of litigation contained in the December 22, 2009, letter and the January 14, 2009, telephone call constitute improper means. Although threats are one of the examples of improper conduct listed in Trau-Med, the Court finds that Defendant's communications of its intention to litigate if the alleged tortious conduct continued are not the type of threats that establish improper means because they are not illegal in nature. See Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC, 461 F. Supp. 2d 629, 641-42 (M.D. Tenn. 2006) (finding that an alleged threat did not constitute improper means where it "was not in any sense illegal."); see also, Armstrong v. Ellington, 312 F. Supp. 1119, 1125 (W.D. Tenn. 1970) ("By definition, a 'threat' in law is a declaration of intention to injure another by some unlawful act."). There is nothing illegal or unlawful about sending a letter or telephoning a party to communicate a legal position asserted in good faith. See Riggs, 879 S.W.2d at 851-52 (affirming trial court's finding of fact that no improper means exist where the defendant merely engaged a lawyer to write a letter stating its legal position).[2] Here, a review of the letter and undisputed facts show that Defendant's communications with National Healing were precisely that: good faith assertions of its legal claims that Plaintiff was in violation of the Agreement and National Healing was interfering with the Agreement. (Docket No. 82 ¶ 19-20). Therefore, Defendant's acts in sending the letter and making the telephone call do not constitute improper means.

---

[2] Plaintiff argues that Riggs is distinguishable because in that case, the defendant wrote a letter to the plaintiff who later showed it to his new employer, whereas in this case, Defendant communicated directly to Plaintiff's new employer. Riggs, 879 S.W.2d 848. Plaintiff, however, does not explain how this distinction changes the analysis. The Riggs Court's finding that a good faith assertion of a legal claim through a communication from a lawyer does not constitute improper means remains intact even after the Plaintiff's distinction. Id. at 851-52.

Additionally, the fact that the Agreement may be unreasonable and unenforceable does not render Defendant's efforts to uphold it improper. Fulmer, 2006 WL 305225 at *4. Attempting to enforce non-competition agreements in good faith through the normal channels of litigation (i.e., obtaining a lawyer, communicating with opposing party, filing a claim) is the necessary and proper way to determine the rights of the parties. Id. See also, Riggs, 879 S.W.2d, at 853 (finding that, in the context of the plaintiff's tortious interference claim, the defendant would have been justified in litigating the question of whether the plaintiff had breached the non-competition agreement). In this case, Defendant's good faith effort to enforce the Agreement and protect its business interests by engaging a lawyer to communicate its legal claim to National Healing was not improper within the meaning of the interference with business relationship tort. Accordingly, Defendant's motion for summary judgement regarding this matter will be granted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike (Docket No. 77) will be denied as moot. Defendant's Motion for Summary Judgment (Docket No. 72) will be granted as to Plaintiff's inducement of breach of contract claims and interference with business relationship claim. Regarding Plaintiff's declaratory judgment claim, the Court will grant summary judgment as to whether Plaintiff's signature binds her to the Agreement, and will deny summary judgment as to whether the Agreement is enforceable.

An appropriate order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE